IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
September 26, 2023 Session

## STATE OF TENNESSEE v. CHRISTOPHER LAYNE SPENCER[1]

**Appeal from the Criminal Court for Knox County**
**No. 118601          Kyle A. Hixson, Judge**

_____

### No. E2022-01276-CCA-R3-CD

_____

The Defendant, Christopher Layne Spencer, was convicted by a Knox County Criminal Court jury of two counts of aggravated sexual battery, a Class B felony, and violating the sexual offender registration act, a Class E felony. *See* T.C.A. §§ 39-13-504 (2018) (aggravated sexual battery); 40-39-211(k) (2019) (sexual offender registry). The Defendant was sentenced to an effective fourteen years for the convictions. On appeal, the Defendant contends that (1) the evidence is insufficient to support his conviction for violating the sexual offender registry, (2) the trial court erred by admitting text messages as evidence, (3) the trial court erred by denying his request for a mistrial, (4) the trial court erred by limiting his closing argument, (5) the prosecutor engaged in improper closing argument, (6) the trial court erred with its jury instructions, and (7) the cumulative effect of the alleged errors entitles him to relief. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which TIMOTHY L. EASTER and JILL BARTEE AYERS., JJ., joined.

Eric Lutton, District Public Defender; and Jonathan Harwell (on appeal), Jackson Whetsel (at trial), and Brooke Spivey (at trial), Assistant District Public Defenders, for the appellant, Christopher Layne Spencer.

Jonathan Skrmetti, Attorney General and Reporter; Garrett D. Ward, Katherine K. Decker, and Courtney Nicole Orr, Assistant Attorneys General; Charme P. Allen, District Attorney General; Ashley McDermott and Jordan Murray, Assistant District Attorneys General, for the appellee, State of Tennessee.

---

[1] Oral Argument in this case was heard at the University of Tennessee College of Law in Knoxville, Tennessee.

# OPINION

The Defendant's convictions relate to a November 19, 2019 sexual encounter involving the then-eleven-year-old victim. The Defendant was indicted for four counts of aggravated sexual battery and one count of violating the sexual offender registry by being alone with the victim in a private area.

At the trial, the then-thirteen-year-old victim testified that her birthday was in June 2008. She said that on November 19, 2019, she lived with her mother and two sisters. The victim began playing volleyball in the sixth grade at age eleven with her sister and a friend, and the victim met the Defendant's daughter, who played on the victim's team. The victim thought the Defendant's daughter was a teenager and an excellent volleyball player. The victim stated that when she played volleyball, her mother and the Defendant talked and socialized. The victim said that although she and the Defendant exchanged pleasantries, they did not engage in meaningful conversation.

The victim testified that on November 19, 2019, the Defendant came to her home to help her and her sister practice serving volleyballs and to cook a casserole. The victim said that the Defendant helped her and her sister with serving volleyballs for "a few minutes" and that the Defendant only demonstrated how to serve the balls and did not touch her. She said this occurred in the living room while her mother and sisters were present. The victim said that afterward, she and her younger sister went to the kitchen to prepare the casserole, that her mother remained in the living room, and that her older sister went to her bedroom.

The victim testified that she, her younger sister, and the Defendant began to prepare the casserole. The victim said that her sister asked to grate the cheese, that the Defendant told her sister to let the victim grate the cheese, and that her sister became aggravated and left the kitchen. The victim said that she and the Defendant were alone in the kitchen and that her mother and sisters could not see her and the Defendant from their various locations inside the house. The victim said that the Defendant moved and stood behind her as she faced the kitchen counter, that he placed his arms "over the top" of her and placed his hands on her hands, and that he showed her a "better way" to grate cheese, although she had been grating the cheese in the same manner. The victim said that she did not "really think[] anything of it," other than "[t]his is the same way. I don't think there's any point in doing this." She said the Defendant moved his hands away from her hands but that, above her clothes, he rubbed her breasts, rubbed down her body to her waist, and rubbed her buttocks. She said he squeezed her breasts and buttocks with his hand. She said he touched her buttocks two or three times. She said that she was shocked, scared, and did not know what to do. She said he "rubbed up and down . . . twice, two or three times." She said that the Defendant walked away but returned about one to three minutes later and that he was more

aggressive with the touching, "almost slapping" her buttocks three or four times. She said she called out for her mother when the Defendant walked away again.

The victim testified that the Defendant put on a jacket and walked outside, that she walked to the living room, and that she told her mother about the Defendant's touching her. The victim said her mother opened the front door and told the Defendant to leave and to "get away from our house." The victim said the Defendant acted as though he were confused, stating, "What did I do?" The victim stated that after he left the home, she and her family went to the victim's friend's house, at which the victim's mother called the police. The victim recalled speaking to the police that evening.

The victim testified that the Defendant did not tickle her and that he rubbed and grabbed her breasts and buttocks. She likewise said that the Defendant did not "scoot" her "just to kind of move [her] out of the way" and that he did not say excuse me. She said the Defendant did not say anything and "just – kept . . . touching me."

On cross-examination, the victim testified that since speaking to the police, she and her mother had discussed the incident. The victim described the layout of the home. She was certain that the Defendant touched her breasts and buttocks with his hands.

The victim's then-twelve-year-old sister testified that she was the youngest of three sisters and that she and the victim played volleyball in November 2019. The victim's younger sister provided testimony consistent with the victim relative to how the family came to know the Defendant and his daughter. The victim's younger sister stated that on the day of the incident, she, the victim, and the Defendant were in the kitchen preparing a hash brown dish for dinner. The victim's younger sister recalled that she wanted to grate the cheese, that the victim wanted to do it, and that the Defendant directed her to allow the victim to grate the cheese. The victim's younger sister said she left the kitchen because she was upset she could not grate the cheese. She said that she went to the living room and sat on the couch with her mother, that a few minutes later the Defendant walked outside to smoke a cigarette, and that the victim, who was crying, came to the living room. The victim's younger sister recalled that the victim's face was red and "swollen with dots all over it" and said that this was common when the victim was upset. The victim's younger sister testified that the victim repeatedly told their mother that the victim needed to talk to their mother, that the victim sat on the couch, and that the victim told them what occurred in the kitchen. The victim's younger sister had never seen the victim scared previously. The victim's younger sister said she did not see the Defendant touch the victim.

The victim's mother testified that the victim and the victim's younger sister joined a volleyball team and that during the games, the parents talked. The victim's mother said she met the Defendant while their children played volleyball. The victim's mother said that she and the Defendant exchanged text messages about the volleyball schedule and saw

each other at the games. She said they "hung out" a few times. She said that the Defendant offered to work with the victim and the victim's younger sister to improve their volleyball skills and that on the day of the incident, the Defendant came to her home to work with the victim and the victim's younger sister. The victim's mother recalled that the Defendant was going to make a casserole while at the home.

The victim's mother testified that after the Defendant and her daughters practiced serving volleyballs, the Defendant, the victim, and the victim's younger sister went to the kitchen to cook. The victim's mother said that while they were cooking, she sat on the couch working on her computer. The victim's mother drew the layout of the home, which was received as an exhibit, and stated that she could not see the kitchen from her vantage point in the living room. The victim's mother recalled that the Defendant and the victim were in the kitchen but could not recall if the victim's younger sister had been in the kitchen. The victim's mother said that as she worked on her computer, the Defendant walked into the living room and went outside through the front door to smoke a cigarette. She recalled that the Defendant had "a different demeanor." The victim's mother said that when the Defendant went outside, the victim came to the living room. The victim's mother said that she had never seen the victim's "appearance change so fast"; that the victim was distraught, red, and shaking; and that the victim explained what occurred in the kitchen.

The victim's mother testified that the victim explained, "Mama, mama, . . . he touched [my] boobs and he touched my butt and . . . it wasn't like a hug. It was like he was rubbing[.]" The victim's mother said that she was traumatized hearing the victim explain what happened and that she then knew the reason "he flew out that door." The victim's mother said that the victim was "emotionally distressed" and difficult to understand. The victim's mother said that she opened the front door, that she told the Defendant she knew what he had done, and that she told him to leave her property. She said that they argued for a few seconds but that the Defendant left. She said that afterward, she and her children went to a friend's home, where she called the police.

The victim's mother testified that, at an unspecified time after the incident but after a "break in communication," she and the Defendant exchanged text messages, which were received as an exhibit. The victim's mother received a message from the Defendant stating, "Don't be mad at me." The victim's mother sent a message stating, "[A]dmit u did it." The Defendant stated, "Please do not f--- my whole life up over a misunderstanding. I will never come around again if that's what you want, but please don't do this[.] I'm begging you. [The victim's mother], please." The victim's mother sent a message stating, "[A]dmit to it then." The Defendant responded, "Thats not how I meant it, hun. I swear on my kids lives[.]" The victim's mother replied, "[H]ow can that be taken any other way?" The Defendant stated, "I was showing her what to do with the food, and tickled her. I tickle my kids all the time[.]" The victim's mother instructed the Defendant not to "be around volleyball any more at all." The Defendant replied, "I love you [the victim's mother]. Im

-4-

sorry I made her uncomfortable, but I didn't do anything on purpose. I love you and your family[.]" The victim's mother requested the telephone number of the mother of the Defendant's children. The Defendant later replied, "This is a misunderstanding. I love you[.]"

The victim's mother testified that text messages were exchanged the next day. The Defendant sent a message stating,

> I was joking with [the victim] and gave her a 'boop' to scoot her over so I could help her cook. There was nothing sexual about it at all. I should have known better and Im very sorry to you and her. The last thing I would ever want to do is hurt you or your family in any way. I hope you know what Im saying is the truth, and I never meant to make her feel uncomfortable.

She responded, "Admit that you inappropriately touched my daughter." The Defendant stated, "Im sorry I made her feel that way, but that wasn't my intent. I care too much about y'all to do that[.]" She stated, "[W]e can do this the hard way or the easy way it's up to you." The Defendant pleaded, "Please don't threaten me. I am physically sick over all this. Whether you think I deserve it or not, please have some mercy, and do not ruin my life. I will be homeless[.]" She replied, "ADMIT IT[.]" The Defendant stated, "I admit t [sic] I'm sorry." She stated, "[S]o you did touch my daughter inappropriately? two options. admit it and turn yourself in OR deny and my counsel will fight harder[.]" The victim's mother explained that she was going to retain an attorney "to speed up this process to get this investigated, to get this taken care of and to get this handled."

The victim's mother and the Defendant continued exchanging text messages. The victim's mother repeated her demand for the Defendant to admit his conduct or "we will take the other route and cause way more stress and hurt for everyone[.]" The Defendant responded, "Wouldnt it be better if we all just went our separate ways? All this is gonna do is ruin a bunch of peoples lives. Why do you want my head on a platter? Do you not have any compassion?" The victim's mother responded, "[I] won't let anyone slide if they do wrong, EVER but I am allowing u the option to go admit that you did this[.]" The Defendant pleaded further, "Please dont drag me and my girls down this road. Im begging you. Find it in your heart to have some compassion and not nuke my whole life. Please[.]" She replied, "[T]hen u should go on and admit what u did[.]" The Defendant stated, "I guess you have never done something you regret and had somebody hurt you when they could have helped you." The victim's mother pressed the Defendant about whether he was going to turn himself in to the police, and the Defendant stated, "I honestly loved you. I know you feel betrayed, but please dont do this." She responded, "last time I'm asking are you going to admit to it and turn yourself in or not….. I'm giving you the option to own up to it one last time." The Defendant responded, "Please, I have kids this weekend. Have some compassion for them, if you cant find any for me[.]" The victim's mother said, "[U]

-5-

have until 3:00 to give me a final answer and if not i will allow the investigator to do what is necessary to protect everyone[.]" The Defendant wanted to know how she could "be so cold," and she denied being cold and stated, "[B]ottom line you inappropriately touched my daughter and u need to admit to it and go turn yourself in TODAY not any other time[.]" The Defendant replied, ". . . I would never do anything to hurt you or your family. I truly loved yall, and wanted nothing but the best for yall." He continued, "I would love to tell [the victim] whatever you think will help her. I did not touch her in an inappropriate way, regardless of what you think[.]" The victim's mother stated, "[A]dmit it you have about killed me from this u have no idea the damage you have done not only to me but her as well[.]" The Defendant replied, "I tapped her with the back of my hand to scoot her over and stirred the meat into the pan. Thats all I did[.]" The Defendant continued, "I tapped her with the back of my hand twice and said I would help her . . . . She even asked me about the beer I had in the coozie afterward. Thats why I was so shocked. I love all you guys."[2]

On cross-examination, the victim's mother testified that she did not go to the kitchen while the Defendant and the victim were alone there. The victim's mother said that a person in the kitchen could not see her from where she sat on the couch in the living room. She said that when she opened the door to confront the Defendant, who was outside, the Defendant shook his head and that the Defendant did not look surprised when she told him to leave. She agreed that the photographs of the text messages did not reflect the exact date the messages were exchanged. She likewise agreed that she exchanged messages with the Defendant "to get him to admit to something" and explained that she was a former paralegal and knew the messages were proof. She denied, though, telling the police that she would contact the Defendant in an effort to obtain a confession. She said that although she exchanged messages with him, the Defendant initiated the contact.

The victim's mother testified that she spoke to the police officers who responded to her telephone call. After refreshing her recollection with a recording of her initial police encounter at the time of the incident, she agreed she told the police that she had "been trying to get him to admit it though text messages" but explained that she made this statement as the Defendant continued to send her messages. She denied threatening the Defendant or pushing him to admit or not to admit anything.

The victim's mother denied being frustrated with the police investigation. When asked if she took the investigation into her hands by creating "evidence, have the ability to

---

[2] Before the trial, the text messages were redacted by order of the trial court. The court instructed the jury that the portions redacted from the messages were not relevant to this case and were not a deletion by any party. The court instructed the jury not to consider the redactions and not to speculate about what might have been redacted. The messages reprinted here are from the redacted portions and are the evidence presented to the jury.

manipulate evidence before capturing evidence, and then giving evidence to the State," she said that the communication went "both ways." She said that if the Defendant had not sent the message stating, "Don't be mad at me," she would have never communicated with him. She said that once the "initial thread was opened," she told the Defendant she knew what he had done to her daughter and to admit it. The victim's mother explained that the "easy way" was for the Defendant to admit his wrongdoing and that the "hard way" was to force the victim to relive the incident in court.

Knoxville Police Investigator (KPD) Timothy Thornton testified that on February 26, 2020, he, Investigator Phyllis Tonkin, and the Defendant spoke inside Investigator Tonkin's police car. A recording of the interview was received as an exhibit and played for the jury.

In the recording, the Defendant stated that he knew the victim because he had dated the victim's mother for a couple of weeks to one month. He stated, "I know what she says happened, but nothing did happen." He said, "There was nothing really to talk about. Nothing did happen." The investigators told the Defendant that this was his opportunity to give his side of the story. Investigator Tonkin read the Defendant his *Miranda* rights, and the Defendant stated that he understood his rights. He said he met the victim's mother through their respective daughters' volleyball league. He said that he was known as Christopher Spencer and denied providing the victim's mother with a false name. He said that the victim's mother told the Defendant's former wife that he gave an alias, which was false, and that the victim's mother was "crazy."

The Defendant stated that he had been to the victim's home but denied assisting the victim and her younger sister with serving volleyballs. He said that when he was at the home, the family watched television in the living room and cooked. He said that the victim assisted him when they cooked, "like kids like to do," and that the victim's mother stayed in the living room. Investigator Tonkin explained that the victim had reported the Defendant touched her inappropriately and that the investigators wanted the Defendant's side of the story. The Defendant agreed that he had not been allowed at the victim's mother's home since the incident but that he did not know what the victim "was referencing." He said there was nothing he had done which could have been considered inappropriate. He did not recall the victim's grating cheese in the kitchen. He said that on the day he was "kicked out" of the home, "we" sat on the couch for a little while before he began cooking, that he took cooking utensils to his truck, and that the victim's mother came outside and "started flipping out." He said that the victim's mother told him that she was going to tell the police that he raped her and that he touched her children inappropriately. He said that he did not understand why rape was the first thing the victim's mother "jumped to," if their relationship was not going to work out. When the investigator clarified that the victim's mother had not accused the Defendant of rape, he stated that the victim's mother threatened to lodge both allegations against him.

The Defendant stated that the victim's mother was in the living room while he and the victim were in the kitchen and that he was "in and out" of the kitchen. When asked why the victim would accuse him of inappropriate touching, he said that he did not know but suspected the victim's mother "had talked her into it." The investigators explained that the victim had undergone a forensic interview, that there was no indication the victim had been "coached," and that the victim's statements and responses were "100% on cue" for having been touched inappropriately. The Defendant denied touching the victim inappropriately.

The Defendant stated that the kitchen was small and agreed that it was possible he made physical contact with the victim while cooking hamburger for the casserole. When asked if it was possible he "moved her out of the way," while cooking, he said that if so, it was not a "significant event in [his] mind" that would have led him to recall it specifically. He said that he did not recall anything occurring that the victim could have misconstrued as inappropriate touching.

The Defendant stated that immediately after he left the victim's mother's home, the victim's mother called him on the telephone wanting his former wife's telephone number. He said that he declined to give the victim's mother the information and that they "probably both" hung up on each other. He admitted that he and the victim's mother exchanged text messages afterward and that he attempted to "reason with her" and to find out why she was trying to "ruin" his life.

The Defendant stated that he and the victim's mother had a romantic relationship but that the victim had never had an issue with his dating her mother. He said, though, that the victim's mother told him that her daughters did not think they needed a man in their lives. He said he did not discipline the children. He said the victim's mother "ambushed him."

When the investigator confronted the Defendant with the text message in which the Defendant admitted he "booped" the victim, the Defendant denied touching the victim inappropriately. The investigator clarified that he was only asking if the Defendant had physical contact with the victim. The investigator said that although the Defendant was now claiming he did not recall having physical contact with the victim, the messages reflected otherwise. The Defendant said he was attempting to "pacify" the victim's mother in "a lot of those conversations." He said that he was pleading with her because he knew his "word wouldn't carry that much weight."

The Defendant did not recall tickling the victim on the day of the incident but said that he let the victim watch him cook and allowed her to stir the ground beef. The investigator read from the text messages exchanged between the Defendant and the victim's mother, in which the Defendant stated, "I was showing her what to do and I tickled

her. I tickle my own kids." He said that he did not remember tickling the victim and that he did not touch her inappropriately. The Defendant said he had not spoken to the victim's mother in two months.

On cross-examination, Investigator Thornton testified that, at the time of the interview, he only knew that the victim had made an allegation and that text messages between the Defendant and the victim's mother had been obtained. Investigator Thornton stated that he believed that "big events . . . get seared into you brain" and that this was not simply an investigative technique. He agreed that the Defendant explained he was attempting to pacify the victim's mother.

The Defendant elected not to present any proof.

Upon this evidence, the Defendant was convicted of two counts of aggravated sexual battery and acquitted of two counts of aggravated sexual battery.

In the second phase of the bifurcated trial, the State presented evidence to the jury related to the sexual offender registration violation. Knox County Sheriff's Department employee Julie Bivens testified that she worked in the criminal processing unit. She said that her unit registered sexual offenders, who had various reporting requirements and were provided an annual updated copy of the sexual offender requirements. Ms. Bivens recognized the Defendant as a result of his reporting to her office, and she identified multiple "registration forms" and a rules and regulations document reflecting the Defendant's signature.

Ms. Bivens testified that on October 14, 2015, the Defendant first reported to her office for placement on the sexual offender registry. She identified a registration form and the rules and regulations the Defendant was required to follow, which she said the Defendant electronically signed at the initial meeting. She likewise identified additional registration forms, which reflected the Defendant's signature and which were related to general informational updates, dated January 19, 2016; April 5, 2016; and May 27, 2016. She identified September 15, 2016; September 12, 2017; September 13, 2018; and September 20, 2019 annual report forms reflecting the Defendant's signatures and stated that the rules and regulations were attached to each form.

On cross-examination, Ms. Bivens testified that the Defendant had never failed to report and to register with her office and that he had never previously been charged with violating the sexual offender registry.

A stipulation of fact was read to the jury and stated as follows:

> The defendant . . . on November 19, 2019, the date of the offense for which the defendant is on trial, was a convicted sexual offender as defined by T.C.A. 40-39-202, having been convicted of a qualifying sexual offense pursuant to general court martial on August 11, 2014, in Ft. Campbell, Kentucky.

KPD Investigator Timothy Thornton testified that during the Defendant's police interview, he explained to the Defendant that he was the officer who worked with registered sexual offenders living in Knoxville. Investigator Thornton stated that during the interview, the Defendant admitted he was on the sexual offender registry.

The victim's mother testified that on November 19, 2019, she did not know the Defendant was a registered sexual offender but that, after the incident, she learned of his status. She said that on the day of the incident, she sat on the couch when the Defendant and the victim were in the kitchen. The victim's mother stated that she could not see into the kitchen from her vantage point and that her view was obstructed by a wall. She said that in order to have seen inside the kitchen, she would have needed to walk into the dining room and then into the kitchen.

On cross-examination, the victim's mother testified that depending upon a person's location in the kitchen and a person's location in the living room, a person in the living room could see into the kitchen and a person in the kitchen could see into the living room. She said, though, that based upon where she sat in the living room and where the victim was in the kitchen, a wall obstructed the view. The victim's mother said that she could not see the victim in the kitchen during the incident.

The Defendant elected not to present any evidence.

Upon this evidence, the jury convicted the Defendant of violating the sexual offender registry by being alone with the victim.

## I.     Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his conviction for violating the sexual offender registry. He does not challenge his aggravated sexual battery convictions. He argues that the evidence is insufficient to show that the Defendant was alone with the victim in a private area. His argument focuses on whether the victim's mother was in the "area" and whether the kitchen was a "private area." The State responds that the evidence is sufficient to support the conviction.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

As relevant to this case, the Tennessee Sexual Offender and Violent Sexual Offender Registration, Verification, and Tracking Act of 2004 prohibits sexual offenders from being "alone with a minor or minors in a private area." T.C.A. § 40-39-211(k)(2).

> "Alone with" means one (1) or more offenders . . . is in the presence of a minor or minors in a private area; and
>
> (a) There is no other adult present in the area;
>
> (b) There is another adult present in the area but the adult is asleep, unconscious, or otherwise unable to observe the offender and the minor or minors;
>
> (c) There is another adult present in the area but the adult present is unable or unwilling to come to the aid of the minor or minors or contact the proper authorities, if necessary; or
>
> (d) There is another adult present in the area but the adult is also a sexual offender . . . mandated to comply with the requirements of this part[.]

T.C.A. § 40-39-211(k)(1)(A)(i)(a)-(d). However, an offender is not "alone with" a minor if the offender is "in a private area where the offender had the right to be," "is engaged in an otherwise lawful activity," and the "presence of the minor . . . is incidental, accidental, or otherwise unrelated to the offender's lawful activity[.]" *Id*. § (k)(1)(A)(ii). Additionally,

"'[p]rivate area' means in or on any real or personal property, regardless of ownership, where the conduct of the offender is not readily observable by anyone but the minor or minors alone with the offender[.]" *Id.* § (k)(1)(B)(i).

Although the Defendant argues that the evidence failed to establish beyond a reasonable doubt that no other adult was present in the area and that his conduct was not readily observable, the evidence reflects, in the light most favorable to the State, that the evidence is sufficient. The incident occurred inside the kitchen of the victim's family home while the Defendant and the victim, who was age eleven, were the only two individuals present. The victim's mother was in the living room working on her computer and was unable to observe the incident. The victim's younger sister was in the living room with her mother and did not observe the incident. The victim's older sister was in her bedroom.

The victim testified that she and the Defendant were alone in the kitchen and that her mother and sisters could not observe her and the Defendant from their respective locations inside the home. The victim's mother drew the layout of the home and testified that she could not see into the kitchen from her vantage point in the living room and would have needed to walk through the dining room in order to view the kitchen. Based upon this evidence, the jury could have found beyond a reasonable doubt that the Defendant and the minor victim were alone in the kitchen and that no other adult was present in the kitchen. *See* T.C.A. § 40-39-211(k)(1)(A)(i)(a); (k)(1)(B)(i). The jury could likewise have found beyond a reasonable doubt that the Defendant and the minor victim were alone in the kitchen and that the victim's mother was unable to observe the Defendant and the victim. *See id.* § (k)(1)(A)(i)(b); (k)(1)(B)(i). The Defendant is not entitled to relief on this basis.

## II.    Text Messages

The Defendant contends that the trial court erred by admitting a text message from the Defendant to the victim's mother. His focus is on the message stating, "I admit t. I'm sorry." He argues that he "had no way to contest" the State's interpretation that the Defendant admitted to inappropriate touching without having to admit he was a registered sexual offender. The State responds that the trial court did not abuse its discretion by admitting the message.

Evidence is relevant and generally admissible when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401, 402. Questions regarding the admissibility and relevance of evidence generally lie within the discretion of the trial court, and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." *State v. Franklin*,

308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)).

A trial court abuses its discretion when it applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006). Relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

The defense filed a pretrial motion to exclude the exchange of text messages between the Defendant and the victim's mother. The defense noted that the messages referred to two topics of discussion, which included whether the Defendant touched the victim inappropriately and the Defendant's being a registered sexual offender. When the trial court asked if the entire conversation was about the Defendant's previous conviction and placement on the sexual offender registry, the defense argued, "It's close, Your Honor, and that's kind of our argument." The defense noted that the State intended to argue that the Defendant confessed to the sexual contact and pointed to the message in which the Defendant stated, "I admit t. I'm sorry." When the court asked if the message contained a typographical error, the defense argued, "We don't know exactly what the T is" or to what was being referred. The defense requested the exclusion of "any mention of the sex offender, sex offender registry" and suggested redacting "anything that mentions the sex offender, sex offender registry." When the court asked the defense to clarify the scope of the motion to exclude, the defense asked the court to exclude the messages in their entirety.

The defense relied upon *State v. McCaleb*, 582 S.W.3d 179 (Tenn. 2019), to support its position that all of the text messages should be excluded. The defense asserted that references to inadmissible matters, including the Defendant's placement on the sexual offender registry, were improper but that the only way to "truly put this [single text message] into context and to show the jury what these statements mean, is for me to cross-examine about the registry or to put [the Defendant] on to explain it." The defense argued that doing so would prejudice the jury against the Defendant and violate his right to a fair trial. Defense counsel stated that the sixteen screenshots of the text messages contained references to the sexual offender registry and prior bad acts and that the only way for the defense to "properly and appropriately contextualize these 16 screens is to talk about them in their entirety. And that's going into otherwise inadmissible evidence[.]"

Although the State sought admission of all of the text messages, it stated that redaction was the best practice to delete references to the sexual offender registry. The prosecutor noted that the trial court had already decided to bifurcate the trial relative to the sexual offender registry allegation. The State argued that many of the Defendant's

statements were clearly in reference to the incident, not the Defendant's status on the sexual offender registry.

After review of the text messages, the trial court found the exchange of messages began as a conversation "completely divorced of any mention" of the sexual offender registry and that the Defendant later offered information that he was placed on the sexual offender registry. The court noted that the exchange did not involve a police officer "brow-beating a defendant with the results of a polygraph examination," as was the case in *McCaleb.* The court redacted three portions of the exchange related to the sexual offender registry.

The first redaction included the following message from the Defendant:

> "I was going to tell you this the next time we were alone and could talk about it. I was accused of touching our babysitter's thigh while I was in the Army. There was no DNA, no proof whatsoever, but the Army convicts everybody who is even accused, regardless. It ruined my career, and had a lot to do with my divorce. I was completely innocent, and my accuser is in jail right now for murder, and tampering with evidence. That is why I am always so careful not to even give the appearance of being [inappropriate] around kids."

The second redaction included this exchange: The victim's mother stated, "ADMIT IT YOUR [sic] ALREADY CONVICTED." The Defendant responded, "I didnt mean it that way, I swear that wasnt my intent."

The third redaction included the following exchange: The victim's mother stated, "[S]o you did touch my daughter inappropriately? Two options: admit it and turn yourself in OR deny and my counsel will fight harder since this is the second conviction[.]" The Defendant asked, "Why are you being so cruel?" The victim's mother replied,

> Spencer, people like u have a real problem. you need serious help and this is how it's gonna be taken care of. this is not cruel this is me protecting my little girl from a sex offender who lied. i am being reasonable and giving you the option to do what is right and begin to make a change. i know u don't understand but my daughter is traumatized from what you did and will be forced to live with this the rest of her life so i am allowing you the option to do what is right and turn you in[.]

The Defendant replied, "I am not a sex offender. I dont have that in my heart. I was falsely convicted, and Im still appealing it. Having the option to give somebody a break, then stepping on their throat and tearing mine and my girls lives apart is cruel." The victim's

-14-

mother responded, "[I]t's up to you either admit it or don't."  The victim's mother sent a photograph of the Defendant from the sexual offender registry and stated, "YOU ARE A REGISTERED SEX OFFENDER[.]"  The Defendant replied, "I shouldnt be, and wouldnt be if I wasnt in the army."

The trial court concluded that the redactions would prevent any prejudicial information from being presented to the jury during the first portion of the bifurcated trial and that the parties could argue to the jury the meaning of the remaining messages, which included the message at issue in this appeal.  The court emphasized the importance that evidence the Defendant was a registered sexual offender not be addressed during the first portion of the trial.  The court ordered the State to have

> a specific conversation with every single witness that they call to the stand to make sure that this testimony is not put before the jury in any way.  I'm not going to promise you they'll [sic] be a mistrial if it happens, because I'll want to see the context of it if it does happen, but I can tell you that is certainly something that would be on the table and nobody wants to go through that under these circumstances.

The record reflects the trial court bifurcated the trial to address the sexual offender registry violation allegation after the jury considered the aggravated sexual battery allegations.  As a result, the court redacted the text messages containing any reference to the Defendant's having been placed on the sexual offender registry before the incident in this case.  In the exchange leading up to the message at issue, the victim's mother stated, "[W]e can do this the hard way or the easy way it's up to you," and the Defendant replied, "Please dont threaten me.  I am physically sick over all this.  Whether you think I deserve it or not, please have some mercy, and dont ruin my life.  I will be homeless[.]"  The victim's mother responded, "ADMIT IT," and the Defendant stated, "I admit t Im sorry."  The victim's mother stated, "[S]o you did touch my daughter inappropriately? two options: admit it and turn yourself in OR deny and my counsel will fight harder[.]"

Although the defense argues that the message "I admit t Im sorry," could have referred to the Defendant's placement on the sexual offender registry, the context of the statements reflects that the discussion was focused on the incident in this case.  The trial court declined to redact the message and allowed the defense to argue the statement was not an admission of guilt.  The evidence was relevant to the jury's determination of guilt.  Further, the probative value of the statement was high and was not substantially outweighed by the danger of unfair prejudice.  The Defendant explained to the police investigators that he was pleading with and attempting to "pacify" the victim's mother in "a lot of those conversations."  We conclude that the trial court did not abuse its discretion by redacting the text messages in connection with the Defendant's placement on the sexual

offender registry and by admitting the text message in which the Defendant stated, "I admit
t Im sorry." The Defendant is not entitled to relief on this basis.

In reaching this conclusion, we have not overlooked the Defendant's reliance on
*McCaleb*, 582 S.W.3d 179. However, this reliance is misplaced. The defendant in
*McCaleb* underwent a polygraph examination and, afterward, a police interview. During
the interview, the police investigator repeatedly accused the defendant of lying based "upon
the polygraph," and the defendant confessed after the polygraph results were presented to
him as "scientific fact." *Id*. at 198. Although evidence that a witness has undergone a
polygraph examination and the corresponding results are generally inadmissible, our
supreme court determined "a significant difference [existed] between a police officer
saying, 'I don't believe you' or 'I believe the victim over you' and saying [repeatedly] 'the
polygraph proves that you are lying." *Id*. In essence, the defendant confessed as a result
of the officer's "referring to the power of the polygraph." *Id*. Because the confession
during the police interview was inextricably connected to the polygraph examination, the
court determined that the trial court did not abuse its discretion by excluding evidence of
the defendant's police interview. *Id*. at 199.

In contrast to *McCaleb*, the text message exchange began as a discussion about the
Defendant's inappropriate touching of the victim, not the Defendant's placement on the
sexual offender registry. Further, based upon the exchange of messages leading to the
Defendant's stating, "I admit t Im sorry," the discussion was about the incident in this case.
The redaction of messages related to the sexual offender status removed the possibility the
jury would learn of the Defendant's sexual offender status in the first part of the trial. The
prejudicial evidence that the Defendant was a registered sexual offender was not so
inextricably linked to the Defendant's incriminating statement of inappropriate touching
that exclusion of the entire exchange of messages was warranted. The trial court did not
abuse its discretion. The Defendant is not entitled to relief on this basis.

### III.    Mistrial

The Defendant contends that the trial court erred by denying his motion for a mistrial
after a juror reported being video recorded by the victim's mother. He argues that although
the court investigated the incident, the denial of the request for a mistrial was prejudicial.
The State responds that the court did not abuse its discretion by denying the motion.

A trial judge should declare a mistrial if manifest necessity arises. *Arnold v. State*,
563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). Manifest necessity occurs when "no
feasible alternative to halting the proceedings" exists. *State v. Knight*, 616 S.W.2d 593,
596 (Tenn. 1981). "The granting or denial of a mistrial is within the sound discretion of
the trial court." *State v. McKinney*, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996); *see*
*State v. Jones*, 802 S.W.2d 221, 222 (Tenn. Crim. App. 1990). This court will only disturb

that decision if the trial court abused its discretion. *State v. Adkins*, 786 S.W.2d 642, 644 (Tenn. 1990).

After the proof connected with the aggravated sexual battery convictions but before closing arguments, the trial court informed the parties that a court officer had reported to the court that a juror thought the victim's mother had been recording the jurors in the courthouse lobby while several jurors waited to be taken to the jury room. The court questioned the juror about the incident. The juror stated that, as several jurors stood outside the district attorney's office, the juror looked "down the steps . . . and raised my head up" and that the "little girl's mom was sitting down a little bit . . . and she had her phone out." The juror stated that he initially did not think much of it but thought it "looked odd to me." The juror continued, "If somebody's texting, they're like this or something like that. But if you're on the phone, you're like this or whatever, but it appeared she had her phone down like this, pointed at us trying to be sly."

The trial judge asked how long this occurred, and the juror stated that he approached "the gentlemen over there. I said everybody needs to split up before something's said, because I think we're being recorded, and that happened for two or three minutes." He said the jurors who were present were waiting on the court officer to let them into the jury room but that he was the only juror standing at the steps. He said that when he saw "it could be a potential problem that we were being recorded," he told the other jurors waiting on the court officer to split up. He said that he told two other jurors they needed to split up and that he did not think the other jurors congregating heard him talk to the two jurors. He did not observe anything which led him to believe that any other jurors saw what he had seen. He said the court officer took them to the jury room shortly thereafter. He recalled that this occurred between 8:30 a.m. and 8:40 a.m.

The juror stated that he told the other two jurors because he wanted them to be aware he believed they were being recorded and because he did not want to "cause a problem." He said that he did not know the victim's mother's intentions but that "it just didn't seem right to me." He felt worried and agreed he "acted differently than [he] would have without that influence."

Upon the conclusion of the juror's testimony, the trial court instructed the juror to "completely put this out of your mind. . . . it has no bearing on the determination that this jury will be asked to make. I can assure you that we're looking into the situation. We'll take any and all appropriate measures that we need to take . . . , but the important thing is that you don't think about this any more [sic]." The juror indicated he would comply with the court's instruction.

The trial court likewise questioned the two jurors to whom the original juror spoke. The first juror stated that he did not recall anything unusual earlier while waiting for the

court officer but said another juror reported "someone involved with [the Defendant] was maybe recording us, but I didn't see that. I mean I didn't look, either, because it was as we were standing[.]" He said that the original juror merely said to "be careful what you say. We may be being recorded, and that . . . was the extent of that." He said that he did not discuss the incident with any other juror and that he did not hear any other juror discussing it. The court told the juror that he wanted to make clear that the situation "had nothing to do with the Defendant." The court, likewise, instructed the juror that the incident had "nothing to do with anything that you'll be called upon to decide as it relates to this case. Do not in any way hold it against . . . either party in this case as you evaluate the evidence that you've heard and the law that you're about to hear, okay." The juror indicated he would comply with the court's instruction.

The second juror stated that nothing unusual occurred before he went to the jury room earlier. He said, though, that the original juror said that the jurors needed "to kind of disburse, somebody was filming us." He thought the original juror said the person recording was the "mom of the victim." He said that he noticed the victim's mother but that he returned to talking to the original juror. He said that the victim's mother had a phone in her hand but that, at the time, she did not have the phone "up or anything like she was taking a video." He said that he did not mention the incident to any other juror and that he did not hear any of the jurors talking about it after they entered the jury room. However, he thought that another juror, who was using his cell phone, could have overheard their discussion. The trial court instructed the juror to "put this discussion out of your mind. . . . Pretend that this discussion and anything that we've talked about . . . did not happen. . . . I want you to know that it will in no way affect the decision that you have to make on this case, and I don't want you holding it for or against either party." The juror indicated that he would comply with the court's instruction.

A third juror, who had been using his cell phone when the original juror and the second juror spoke, was questioned by the trial court. The juror did not recall observing anything unusual and said he spoke to other jurors about matters unrelated to the trial. The court instructed the juror to "pretend that this conversation never happened, put it out of your mind and don't refer to it. It has nothing to do with the questions that we'll be asking you to decide in this case[.]" The juror indicated he would comply with the court's instruction.

Although the trial court thought that it had "isolated anyone who knows" about the alleged incident, out of an abundance of caution the court individually polled the remaining jurors to ensure nobody else heard or saw anything related to being potentially recorded. All of the remaining jurors each stated that they did not see anything unusual and that they did not hear any fellow jurors talking about anything unusual. The court instructed each juror consistent with its previous instructions, and the jurors indicated they would comply

with the court's instructions.  After questioning the remaining jurors, the court permitted the parties to present any relevant proof.

The State presented Katherine Jones, Access Control Administrator for Public Building Authority (PBA), who testified that she controlled access for PBA properties, which included the courthouse, and that she had access to video recordings from the security equipment within the courthouse.  Ms. Jones stated that the prosecutor's victim/witness coordinator asked her to review security footage from earlier in the day. Ms. Jones said she was directed to review the recording of two women, one of whom wore a cream-colored shirt.  Ms. Jones stated that at 8:29 a.m., the two women walked upstairs from the main floor and entered the "first floor" and that the women walked inside the district attorney's office.  Ms. Jones said that at 8:31 a.m., the women left the district attorney's office and walked to the courthouse coffee shop.  Ms. Jones said that the women left the coffee shop at 8:41 a.m., that the women sat in a "seating area" near the elevator and outside the coffee shop at 8:42 a.m., and that a police investigator, whom Ms. Jones recognized, sat with the women.  Ms. Jones said that the victim/witness coordinator joined the women and the investigator at 8:43 a.m.  Ms. Jones said that the women did not do anything with a cell phone and that it appeared the women were waiting in line for their food.  Ms. Jones said that she did not see a group of jurors congregating in the area where the women had been.

On cross-examination, Ms. Jones testified that only one camera panned the area and that this camera, along with others, was used to follow the women's movements within the courthouse.  She agreed that the women were not in the cameras' view at times but that the women stood "right in front of the camera" inside the coffee shop.  She said she saw the women's hands "pretty clear" in the recording.  She said that after the women sat, she clearly saw one of the women removing her food from the coffee shop bag.

The victim's mother testified that she and the victim entered the courthouse's main entrance, went through the metal detectors, walked the long hallway to the first-floor lobby, and went upstairs to the floor on which the courtroom was located.  She said that they looked around for "any of our parties" and that they went "straight to" a private room affiliated with the district attorney's office.  She said that the victim wanted food and that they went to the coffee shop, where they waited several minutes for the food.  The victim's mother said that they saw the victim's grandmother and "John" in the hallway, that they sat, that the prosecutor's victim/witness coordinator and Investigator Tonkin approached them, that they talked for a few minutes, and that they returned to the private room.

The victim's mother testified that she saw a juror in the coffee shop but that she did not speak to the juror.  She denied seeing the jurors congregating in the courthouse.  She said that she left her cell phone in the private room before going to the coffee shop but that she had a "little wallet which is the size of a smaller phone . . . but it was just a little wallet."

-19-

The defense chose not to question the victim's mother.

Erin Morrison, the victim/witness coordinator, testified that she requested Ms. Jones retrieve the relevant surveillance recording footage inside the courthouse. Ms. Morrison stated her review of the recording did not reflect that the victim's mother video recorded anyone inside the courthouse. Ms. Morrison said that she saw the victim's mother and the victim sitting in the "seating area" in the courthouse and that she escorted them back to the private room. Ms. Morrison recalled that when they entered the private room, the lights had been off and that she saw a purse and a laptop computer on the couch. Ms. Morrison said that they stayed in the private room for about ten minutes and that she walked the victim's mother and the victim to the courtroom. Ms. Morrison did not see the victim's mother with a phone during this time.

Upon this testimony, the defense moved for a mistrial on the basis of "tampering with the jury or undue influence of the jury." The Defendant argued that he was "not going to get a fair determination of guilt because of this undue influence based on [the original juror's] observation." The defense noted that the jurors wanted the trial court to know that they had not "started early deliberations" and argued that this was "indicative that [the jurors were] worried about being in trouble should they find a certain way in this trial." The defense questioned whether the State had rehabilitated the problem of undue influence because Ms. Jones provided inconsistent testimony with that of the testimony of the original juror. The defense noted that Ms. Jones said she "could never see a group of jurors there." The defense argued that "we have a sworn juror who has lied on the record and that cannot sustain, that is not appropriate. That cannot be a foundation for a fair trial."

The State argued that the evidence did not reflect that anyone had lied but rather, that Ms. Jones did not see any jurors in the particular area the victim's mother had been in the courthouse. The State argued that the evidence from Ms. Jones, the victim's mother, and Ms. Morrison showed that the victim's mother had not done anything inappropriate to attempt to influence the jury. The prosecutor conceded that the trial court could excuse the original juror who thought someone had recorded the jurors on the basis that the juror "felt intimidated." The defense objected to excusing the juror.

The trial court found that all of the witnesses had been truthful. The court found that although the original juror believed he had been recorded, the juror had no methodology to verify his suspicions. The court found that the juror reported the suspicious activity, as the court had previously instructed, and that after questioning all of the jurors, none of them had seen the alleged suspicious activity. The court credited the testimony of Ms. Jones and the victim's mother. The court found that Ms. Morrison's testimony corroborated the victim's mother's testimony that the victim's mother's cell phone remained in the private room, noting that Ms. Morrison stated that she never saw the victim's mother's cell phone in the courthouse lobby. The court, likewise, found that Ms.

Jones's testimony about what the surveillance recording reflected was consistent with the victim's mother's testimony. The court found that the victim's mother did not record the jurors and that the victim's mother possibly held a "clutch or something in her hand."

The trial court found that there had been no undue influence on the jurors "by any sort of extra-judicial means." The court noted that it had instructed all of the jurors "to put this situation entirely out of their heads, and they all indicated that they would be able to do that. The jurors are presumed to follow the instructions of the Court. And I feel confident that this jury will be able to do that." The court determined that there was not a manifest necessity for a mistrial. The court declined to excuse the original juror, and it noted that the juror merely followed the court's previous instructions. The court, however, requested that the original juror be brought to the courtroom, at which time the court told the juror that the court had investigated the matter and that "nothing nefarious" occurred. The court instructed the juror that he was to put the incident out of his mind, that the incident was not evidence and could not be considered during deliberations, and that the incident could not impact his verdict. The juror stated he would follow the court's instructions.

The record reflects that the trial court conducted an extensive investigation about an allegation of video recording the jurors in the courthouse. The court questioned all of the jurors and heard testimony from multiple witnesses. The court found that although the original juror believed the victim's mother might have video recorded the jurors, the evidence received by the court indicated the victim's mother had not recorded the jurors. The court, likewise, instructed the jurors that the alleged incident was not evidence, could not to be considered during deliberations, and had no bearing on the assessment of the trial evidence. The jurors are presumed to have followed the court's instructions. *See State v. Young*, 196 S.W.3d 85, 111 (Tenn. 2006); *State v. Shaw*, 37 S.W.3d 900, 904 (Tenn. 2001). We conclude that the trial court did not abuse its discretion by denying the motion for a mistrial. The Defendant is not entitled to relief on this basis.

## IV.    Closing Argument Limitations

The Defendant contends that the trial court erred by limiting his closing argument. He argues the trial court erred by prohibiting the defense from displaying a visual aid contrasting reasonable doubt with the other standards of proof during closing argument and from discussing the lesser standards of proof during closing argument. The State responds that the trial court did not err by precluding the defense from showing the jury the chart of the various standards of proof and from arguing any standard of proof other than beyond a reasonable doubt.

Closing argument is "a valuable privilege that should not be unduly restricted." *Terry v. State*, 46 S.W.3d 147, 156 (Tenn. 2001); *see State v. Bane*, 57 S.W.3d 411, 425

-21-

(Tenn. 2001); *State v. Cauthern*, 967 S.W.2d 726, 737 (Tenn. 1998). However, closing argument "must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." *State v. Goltz*, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003); *see State v. Jordan*, 325 S.W.3d 1, 64 (Tenn. 2010). A trial court has significant discretion in controlling closing argument, and its decisions relative to the contents of argument may only be reversed upon an abuse of discretion. *Terry*, 46 S.W.3d at 156; *Cauthern*, 967 S.W.2d at 737; *Smith v. State*, 527 S.W.2d 737, 739 (Tenn. 1975).

The record reflects that during the defense's closing argument, trial counsel displayed a demonstrative chart of the various burdens of proof. The chart, which was received as an exhibit to the motion for a new trial hearing, depicts a staircase in which each of the seven steps identified a different burden of proof. The bottom step reflects "No evidence" with the explanation, "No trace of evidence whatsoever." The second step reflects "Scintilla" with the explanation, "Any evidence at all. Even the smallest measurable amount of evidence." The third step reflects "Reasonable Suspicion" with the explanation, "Should be based on specific or particular facts or reasons. Not based on a hunch or guess." The fourth step reflects, "Probable Cause" with the explanation, "Reasonable and trustworthy information that a particular person has committed a particular crime." The fifth step reflects, "Preponderance" with the explanation, "The greater weight or amount of the evidence." The sixth step reflects "Clear and Convincing" with the explanation, "A firm belief that the allegations are true." The final step reflects "Reasonable Doubt." Although there is no visible explanation for reasonable doubt, the top of this final step states, "Guilty."

The prosecution requested a bench conference out of the jury's hearing. The prosecutor objected to the chart showing the "different degrees of proof." Defense counsel argued that the chart was a demonstrative tool showing the jurors the "levels of proof that they need . . . . I can clearly walk through them with or without [the chart], but I think it's highly effective, and I don't see anything objectionable to it." The court stated as follows:.

Well, I don't think you can walk through all of that without it, and here's why. For one, we're talking about reasonable doubt is perhaps the most over-defined two words in the English language.

Really the definition is quite simple. We've got it down to about two sentences in our instructions. That's the law on reasonable doubt.

My issue with a visual representation like that is that it attaches visual definition using place and distance to describe reasonable doubt that is not recognized in the law.

-22-

This particular chart also includes several legal standards that this jury has not received instructions on and they're not at play at all in this case. It includes scintilla, reasonable suspicion, probable cause, clear and convincing. Those are legal standards that are entirely inapplicable to what this jury is to decide.

The only other definition that the jury will receive in this case that's located on this chart is preponderance of the evidence and that relates to their finding on venue.

So at the end of the day, I think this is an inappropriate visual representation of a legal standard that is adequately described as it is in the instructions. I think by introducing multiple other legal standards that are not at play in this case it could run the risk of confusing and misleading the jury.

The court permitted the defense to "put up" for the jury the reasonable doubt instruction but, upon the objection by the State, prohibited the defense from discussing other standards of proof.

At the motion for a new trial hearing, the defense noted that the trial court determined that the chart would have been confusing to the jury and that the defense could not speak to the jury during closing argument about the various standards of proof. The defense argued that the standards of proof were not legally incorrect and that the State would have had the opportunity to clarify any confusion during rebuttal argument. The defense argued that because the content of the visual aid was legally correct, the court erred by excluding it. The defense argued, alternatively, that even if the court properly precluded the defense from utilizing the visual aid, the court erred by prohibiting the defense from discussing the standards of proof in order to explain to the jury "how high the standard is for reasonable doubt." The trial court again determined that to expose the jury to inapplicable standards of proof for which it would not receive an instruction was "blatantly incorrect." The court noted that the definition of beyond a reasonable doubt was not "a staircase" and included "nothing about this being the most stringent burden of proof available at law." The defense asserted that the parties were given latitude during closing argument to explain their position and that the purpose of the chart was to aid the defense in explaining its case to the jury.

A trial court's decision to admit or to exclude demonstrative evidence is reviewed for an abuse of discretion. *State v. Coulter*, 67 S.W.3d 3, 55-56 (Tenn. Crim. App. 2001); *see State v. Underwood*, 669 S.W.2d 700, 704 (Tenn. Crim. App. 1984). However, "[d]emonstrative evidence is admissible only if relevant" pursuant to the Tennessee Rules of Evidence. *Coulter*, 67 S.W.3d at 56 (internal quotations and citation omitted). Further,

-23-

demonstrative aids may likewise be permissible during closing argument. *See State v. Michael Presson*, No. W2012-00023-CCA-R3-CD, 2014 WL 1669860, at *22-23 (Tenn. Crim. App. Apr. 14, 2014), *perm. app. denied* (Tenn. Nov. 10, 2014). Demonstrative aids should "assist the trier of fact in understanding and evaluating the other evidence offered at trial," and we review a trial court's decision to permit the use of demonstrative aids for an abuse of discretion. *Coulter*, 67 S.W.3d at 56; *see Michael Presson*, 2014 WL 1669860, at *22-23. A trial court abuses its discretion when it applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *Ruiz*, 204 S.W.3d at 778.

The record reflects that the trial court determined that scintilla, reasonable suspicion, probable cause, and clear and convincing evidence standards contained in the chart were irrelevant to jury's determination of guilt or innocent and that reasonable doubt would be defined consistent with the pattern jury instructions. *See* Tenn. R. Evid 401, 402. The court, likewise, determined that presenting and discussing standards of proof irrelevant to the proceedings had the potential to confuse and mislead the jury. *See* Tenn. R. Evid. 403. The court had discretion to limit and control closing arguments and determined that the demonstrative aid contained standards of proof irrelevant to the criminal trial, which was not illogical and unreasonable in this case. *See Coulter*, 67 S.W.3d at 56. Further, the record supports a finding that discussing and displaying standards of proof, upon which the jury would not receive an instruction, could confuse and mislead the jury about the law to be applied when deliberating the Defendant's guilt or innocence. *See id*.

Although persuasive authority, we note that other jurisdictions have upheld similar trial court determinations pursuant to an abuse of discretion standard of review. *See Drake and Charles v. State*, 975 A.2d 204, 218 (Md. App. 2009) (upholding the limitation during closing argument to discussing reasonable doubt standard consistent with the pattern jury instructions and to compare reasonable doubt to preponderance of the evidence on the basis that comparison to extraneous standards of proof was irrelevant to the proceedings and could confuse the jury about the law). In *Grillot v. State*, 107 S.W.3d 136, 149 (Ark. 2003), the defense attempted to display a "chart illustrating and comparing the various burden-of-proof standards used in the law." However, the State objected, and the trial court allowed the chart to be displayed but prohibited the defense from discussing any standard of proof other than beyond a reasonable doubt. In affirming the trial court's ruling, the Arkansas Supreme Court noted that the trial court is afforded "broad discretion to control counsel in closing arguments" and that appellate courts could not interfere absent a "manifest abuse of discretion." *Id*. (citing *Smith v. State*, 98 S.W.3d 433 (Ark. 2003)). The supreme court concluded that the trial court "properly guarded against the jury becoming confused by other burden-of-proof standards that are inapplicable in criminal cases" and noted that the trial court properly instructed the jury on the proper burden of proof. *Grillot*, 107 S.W.3d at 149-50.

Based upon the foregoing, we conclude that the Defendant failed to demonstrate that the trial court abused its discretion by prohibiting the defense from displaying the demonstrative aid and from discussing during closing argument burdens of proof other than beyond a reasonable doubt for determining the Defendant's guilt or innocence. The Defendant is not entitled to relief on this basis.

## V.  Improper Closing Argument by the State

The Defendant contends that the prosecutor engaged in improper argument by stating multiple times, without supporting trial evidence, that traumatic memories were "seared" in the mind and that, as a result, were reliable. He likewise argues that the prosecutor vouched for the victim's credibility and offered her opinion that the Defendant lied when he denied wrongdoing during his police interview. The State responds that the Defendant failed to object contemporaneously during closing argument and that he is not entitled to plain error relief.

As a preliminary matter, we note that the Defendant did not object to the prosecutor's closing argument at the trial. However, in his supplemental motion for a new trial, the defense alleged prosecutorial misconduct by (1) stating that certain events were seared into the brain absent any evidence, expert and lay, relative to whether "such memories occur or are particularly reliable" and (2) vouching for the victim's credibility in offering the prosecutor's personal opinion. The prosecutor generally responded that the closing arguments were in response to statements made by the defense during its closing argument. The prosecutor did not address specifically the defense's allegation that the prosecutor argued facts not in evidence and vouched for the victim's credibility. After argument by the parties at the motion hearing, the trial court denied the request for a new trial "based upon the pleadings in the record of the case." The trial court did not expound, and the written order merely stated, "For reasons stated on the record, the motion for a new trial is respectfully DENIED."

Because the Defendant failed to object contemporaneously to alleged prosecutorial misconduct during closing argument at the trial but later raised the claim in the motion for a new trial, our review is limited to plain error. *See State v. Enix*, 653 S.W.3d 692, 700-01 (Tenn. 2022). Plain error relief is limited to errors which are "clear, conspicuous, or obvious" and which affect the defendant's substantial rights. *State v. Martin*, 505 S.W.3d 492, 504 (Tenn. 2016). Five factors are relevant

> when deciding whether an error constitutes "plain error" in the absence of an objection at trial: "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely

-25-

affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)); *see also State v. Minor*, 546 S.W.3d 59, 70 (Tenn. 2018). All five factors must exist in order for plain error to be recognized. *Smith*, 24 S.W.3d at 283. "[C]omplete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id.* In order for this court to reverse the judgment of a trial court, the error must be "of such a great magnitude that it probably changed the outcome of the trial." *Id.*; *Adkisson*, 899 S.W.2d at 642.

Closing argument is "a valuable privilege that should not be unduly restricted." *Terry*, 46 S.W.3d at 156; *see Bane*, 57 S.W.3d at 425; *Cauthern*, 967 S.W.2d at 737. However, closing argument "must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." *Goltz*, 111 S.W.3d at 5; *see Jordan*, 325 S.W.3d at 64. A trial court has significant discretion in controlling closing argument, and its decisions relative to the contents of argument may only be reversed upon an abuse of discretion. *Terry*, 46 S.W.3d at 156; *Cauthern*, 967 S.W.2d at 737; *Smith*, 527 S.W.2d at 739.

Although an exhaustive list of the bounds of prosecutorial impropriety cannot be defined, five general areas of prosecutorial misconduct have been recognized:

> 1. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

> 2. It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant. *See State v. Thornton*, 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999); *Lackey v. State*, 578 S.W.2d 101, 107 (Tenn. Crim. App. 1978); Tenn. Code of Prof'l Responsibility DR 7–106(c)(4).

> 3. The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury. *See Cauthern*, 967 S.W.2d at 737; *State v. Stephenson*, 878 S.W.2d 530, 541 (Tenn. 1994).

> 4. The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by

making predictions of the consequences of the jury's verdict. *See Cauthern*, 967 S.W.2d at 737; *State v. Keen*, 926 S.W.2d 727, 736 (Tenn. 1994).

5. It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

Standards Relating To The Prosecution Function And The Defense Function §§ 5.8–5.9 Commentary (ABA Project on Standards for Criminal Justice, Approved Draft 1971).

*Goltz*, 111 S.W.3d at 6.

If improper argument occurs, a new trial is required only if the argument affected the outcome of the trial to a defendant's prejudice. *Bane*, 57 S.W.3d at 425. In determining whether prosecutorial misconduct affected the jury verdict to prejudice a defendant, this court has stated a court should consider the conduct in light and in context of the facts and circumstances of the case, any curative measures taken by the trial court and the prosecutor, the prosecutor's intent in making the comment, the cumulative effect of the improper comment and any additional errors, the strength or weakness of the case, whether the prosecutor's comments were lengthy and repeated or isolated, and whether the comments were in response to defense counsel's closing argument. *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976); *see Goltz*, 111 S.W.3d at 5-6.

## A.     Seared Comments

The record reflects that during the State's initial closing argument, the prosecutor stated as follows:

> And that's where I want to start. Because we're all humans, and we all come from different backgrounds and we all have different experiences. But we all have those moments, those moments that are seared into our brain. We have the happy moments, that could be what you got at one Christmas, something that you really wanted or maybe it was graduating high school or maybe it was your first kiss.

> Those moments are seared into your brain. You have the traumatic moments, the trauma. Maybe it was a loss of a loved-one, maybe it was some sort of injury. Maybe you were in a car wreck, something of that nature, but that's seared into your brain, and that's what Detective Thornton was talking about. That's what Detective Tonkin was talking about. It's something you'll remember vividly.

-27-

And whether it's hours later, days later, months later, years later, that's going to be something that's going to be seared into your brain. That's something that you're going to be able to remember and recall.

And I want to talk about the one side of the story, [the victim's] story, of what's seared into her brain. Because what happened on November 19th of 2019 when she was 11-years-old is seared into her brain.

The prosecutor continued, discussing the victim's testimony about the sequence of events leading to the touching allegations. The prosecutor noted that the victim recalled that she could not find the cheese grater and used a potato peeler to grate the cheese for the casserole. The prosecutor argued in connection with this testimony that

what is important is that when you have those moments, those moments that are seared into your brain, you remember those details. You remember those little things, those little things that maybe don't matter about the big picture, but those things stand out into your mind because this is a moment that's been seared into your brain.

Relative to the victim's description of the Defendant's touching, the prosecutor asserted that the victim was able to demonstrate the touching during her testimony because "that's seared into her brain. That's what she remembers vividly." The prosecutor also submitted to the jury that the second incident of touching after a one to three minute break was "worse" because the victim testified the touching was more aggressive. The prosecutor said, "[t]hat moment is seared into her brain." Last, the prosecutor stated,

I submit to you that the proof in this case has shown that she is absolutely one hundred percent certain. She responded she was certain that [the Defendant] touched her with his hand. She was positive that [the Defendant] touched her on top of her clothes. That's the story that's seared into her brain. That's the story that she vividly remembers.

The record reflects that during the police interview, the Defendant said that he did not recall anything the victim could have misconstrued as inappropriate touching. Likewise during the interview, Investigator Thornton stated,

You know, everyday events, but that was followed up with something that was gonna be seared in your brain. Because now you're being told, hey, your words, Imma tell them you raped me. Imma tell you did this to my kids. That's something what would sear into your brain so that the events surrounding prior and after that are gonna be something you would remember.

After the recording was played for the jury, the trial court instructed the jury about the nature of the Defendant's statements. The court instructed the jury that the only statements it could consider as evidence were "solely the responses of the defendant[.]" The court instructed further that the jurors could consider, as substantive evidence during deliberations, the Defendant's responses, tone, demeanor, and "other things related to his particular statements." The court explained that the investigators' statements and questions were to "provide context and let you know what the conversation is about." The court repeated its limiting instruction during the final jury instructions by stating, "You may not consider the statements or questions asked by the investigators as substantive evidence." The jurors are presumed to have followed the court's instructions. *See Young*, 196 S.W.3d at 111; *Shaw*, 37 S.W.3d at 904. However, Investigator Thornton testified on cross-examination that he believed that "big events . . . get seared into your brain" and that this was not simply an investigative technique.

It is improper for a prosecutor, in relevant part, to misstate the evidence or to make arguments not reasonably based on the evidence. *See State v. Bates*, 804 S.W.2d 868, 881 (Tenn. 1991); *Goltz*, 111 S.W.3d at 6. It is likewise impermissible to argue "facts which are outside the record." *State v. Bowers*, 77 S.W.3d 776, 787 (Tenn. Crim. App. 2001); *see State v. Beasley*, 536 S.W.2d 328, 330 (Tenn. 1976). Although the initial reference to traumatic events being seared into a person's brain occurred during the Defendant's police interview and could not be considered as substantive evidence in determining the Defendant's guilt or innocence, the investigator testified that he believed traumatic events were, in fact, seared in a person's brain. Although not an expert opinion, the investigator arguably expressed a lay opinion based upon his perception or observation. *See* Tenn. R. Evid. 701. The jury was free to credit or discredit this testimony, but the evidence was nonetheless presented at the trial. Further, the victim testified with specificity about the touching and was certain about the accuracy. As a result, the Defendant has failed to establish he is entitled to a new trial as a matter of plain error.

## B.    Vouching

The Defendant points to multiple statements in the State's rebuttal closing argument in which he asserts the prosecutor improperly vouched for the victim's credibility and improperly asserted the Defendant lied during his police interview. The prosecutor stated, in relevant part, as follows:

> . . . [the victim's mother's] child came to her and immediately after this incident happened and said this is what happened to me. She saw her child's demeanor. She knows [the victim], she knows how she is. She believed her. She knew this to be true. She saw her reaction.

[The victim] is not imagining this. It's not like a fairytale or something that she's making up. She was 11, yes, and we do say that kids are different than adults, but they're not different in how they would perceive something like this.

They may be different in their emotional ability to cope with something like this. But she's not imagining what he did to her. And she's certainly reacting in a way that's absolutely appropriate to something like this happening.

. . . .

He goes into detail to try to explain what he did. He says, "I tapped her with the back of my hand to scoot her over and stir the meat in the pan. That's all I did. She was stirring it over the stove. I tapped her with the back of my hand twice and said I would help her. I put the spoiled meat back in the pan and stirred it so it would brown."

"She . . . even asked me about the beer I had in the coozie afterwards. That's why I was so shocked. I love all of you guys."

Specific, detailed explanation of what happened from the defendant. Not true. He's lying whenever he says that's how it went down.

But it's important to note that at the beginning he's giving this very detailed, very specific explanation as to what happened, what everybody's doing, what he's doing with his hands. And then, then, after the text messages and he's talking to the investigators, suddenly he doesn't remember any of this at all.

. . . .

And the reason that he has these inconsistent statements is because it's hard to maintain a lie. It is hard to lie about something and then have some time go by and to continue with that same lie. We all know that in everyday life. But you know what's easy to do? To tell the truth. To tell the truth about what happened. That's what [the victim] did. That's what [the victim is] doing.

. . . .

-30-

. . . "I was trying to pacify her in a lot of those conversations." That's his explanation for why he said these things in the text messages.

It doesn't make sense because it's not true. Because what happened in this case, what the truth is in this case, is that the defendant inappropriately touched this little girl. . . .

She was specific about what happened; she was not confused. She didn't imagine this. This was something real that happened to her. As he said, she remembers even the potato peeler. She's holding the potato peeler.

. . . .

But [the victim is] brave. She's brave because when that happened she knew it was wrong. She went in, she told her mom right away. She told her mom right away and he left.

When you all go back to the jury room, do not look at this little girl that came on the stand that was upset because it was difficult for her. She cried, she didn't want to be here. Her and her mom, her little sister . . . , are not the mastermind behind some plot for some reason to frame this guy. They're here to tell you what happened on that day.

And we're asking you all to find him guilty of the crimes that he committed. Find him guilty of aggravated sexual battery because that's absolutely what he did to this little child. Thank you.

Vouching occurs when a prosecutor expresses personal opinion that a witness is telling the truth. *See, e.g.*, *State v. Sexton*, 368 S.W.3d 371, 419-20 (Tenn. 2012); *Goltz*, 111 S.W.3d at 6-7. Our supreme court has repeatedly condemned a prosecutor's expression of personal belief in the truth or falsity of evidence. *See, e.g.*, *Sexton*, 368 S.W.3d at 420. The term "bolstering" generally refers to the admission of a witness's prior consistent statement. *See State v. Hodge*, 989 S.W.2d 717, 725 (Tenn. Crim. App. 1998); *State v. Robert D. Walsh*, No. W1999-01473-CCA-R3-CD, 2001 WL 91949, at *8 (Tenn. Crim. App. Jan. 30, 2001) ("'[B]olstering' generally refers to the situation in which the state offers a prior consistent statement of the victim to enhance the credibility of her testimony at trial."), *perm. app. denied* (Tenn. June 4, 2001).

Despite the theme in the rebuttal closing argument that the victim was credible and that the Defendant was not credible, the prosecutor's arguments were focused on explaining why the jury should credit the victim's testimony and discredit the Defendant's statements. We are concerned about the tenor of the prosecutor's rebuttal argument, and

-31-

we caution her that the prudent course is to preface such argument with " I argue" or "I submit" that a witness is credible or incredible. *See State v. Stephano Lee Weilacker*, No. M2016-00546-CCA-R3-CD, 2018 WL 5099779, at * 6 (Tenn. Crim. App. Oct. 19, 2019) ("Words such as 'I submit' before the prosecutor's challenged observation are not the equivalent of a personalized opinion.") (citing *State v. Thornton*, 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999); *see also United States v. Stulga*, 584 F.2d 142, 147 (6th Cir. 1978)). However, the prosecutor did not make inappropriate statements about her personal belief in the victim's testimony and the Defendant's statements to the police. To the contrary, the prosecutor's statements were based upon the evidence and were focused on explaining why the victim testified truthfully and why the State theorized that the Defendant's explanations in the text messages and in the subsequent police interview were inconsistent and not credible. *See State v. West*, 767 S.W.2d 387, 394 (Tenn. 1989); *State v. Beasley*, 536 S.W.2d at 330 (adopting the view of other jurisdictions in which a prosecutor may refer "to 'lying' defendants or defense witnesses . . . if based upon evidence in the record."). As a result, we conclude that the Defendant has failed to establish he is entitled to a new trial as a matter of plain error. He is not entitled to relief on this basis.

## VI. Jury Instructions

The Defendant contends that the trial court erred by failing to instruct the jury on the definition of being alone with the victim in a private place, which he argues is "a critical element" of his conviction for violating the sexual offender registry. The State responds that the Defendant failed to object contemporaneously to the trial court's jury instructions and that he is not entitled to plain error relief.

A criminal defendant has "a right to a correct and complete charge of the law." *Hanson*, 279 S.W.3d at 280 (citing *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000)). As a result, a trial court has a duty "to give proper jury instructions as to the law governing the issues raised by the nature of the proceeding and the evidence introduced at trial." *State v. Hawkins*, 406 S.W.3d 121, 129 (Tenn. 2013) (citing *Dorantes*, 331 S.W.3d at 390); *see State v. Thompson*, 519 S.W.2d 789, 792 (Tenn. 1975). An erroneous jury instruction, though, may deprive the defendant of the constitutional right to a jury trial. *See Garrison*, 40 S.W.3d at 433-34. "An instruction should be considered prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law." *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005); *see State v. Vann*, 976 S.W.2d 93, 101 (Tenn. 1998).

In a jury-out hearing, the parties did not request any modifications to the court's proposed jury instructions, and the trial court stated that it had included the previous qualifying sexual offender conviction in the instructions. However, the court stated that it *sua sponte* had modified the second portion related to the statutory definition of "alone with" the minor. The court stated that it had omitted the portion of the definition referring

to the offender's being in a private area where he has a right to be and engaged in otherwise lawful activity. The court, relying on *State v. Perrier*, 536 S.W.3d 388 (Tenn. 2017), reasoned that the language was similar to the language in the self-defense statute in connection with the duty to retreat. The court explained that if a person is somewhere the person has a right to be and is acting lawfully, the person has no duty to retreat before engaging in self-defense. The court stated, though, that in the context of sexual offenders, if the person is somewhere the person has a right to be and is acting lawfully, the person has the ability to argue that the person's presence around the minor was incidental, accidental, or otherwise unrelated to his lawful activity. The court determined that, as a result, the procedure utilized in *Perrier* was appropriate in this case, which required the court to determine by clear and convincing evidence whether the Defendant was engaged in unlawful activity at the time of the incident.

The trial court determined, based upon clear and convincing evidence, that the Defendant was engaged in unlawful activity and that, as a result, the Defendant was prohibited from arguing to the jury that his presence around the victim was incidental, accidental, or otherwise unrelated to his lawful activity. The defense did not object to the trial court's determination or to the final jury instructions. The court instructed the jury, in relevant part, as follows:

> The defendant is charged . . . with Violation of Sex Offender Residential Restrictions. Any person who violates sex offender residential restrictions is guilty of a crime. For you to find the defendant guilty of this offense, the State must have proven beyond a reasonable doubt the existence of the following essential elements:
>
> (1) that the defendant, as of November 19th, 2019, was a convicted sexual offender as defined in Tenn. Code Ann. Section 40-39-202, having been convicted of a qualifying sexual offense pursuant to General Court Martial on August 11, 2014, in Fort Campbell, Kentucky;
>
> and
>
> (2) that the defendant was alone with a minor or minors in a private area; and
>
> (3) that the defendant acted either intentionally or knowingly.
>
> "Alone with" means one or more offenders covered in this subsection is in the presence of a minor or minors in a private area; and
>
> (i) There is no other adult present in the area;

-33-

(ii) There is another adult present in the area but the adult is asleep, unconscious, or otherwise unable to observe the offender and the minor or minors;

or

(iii) There is another adult present in the area but the adult present is unable or unwilling to come to the aid of the minor or minors or contact the proper authorities, if necessary.

"Minor" means any person under eighteen (18) years of age.

"Private area" means in or on any real or personal property, regardless of ownership, where the conduct of the defendant is not readily observable by anyone but the minor or minors alone with the offender.

"Knowingly" and "intentionally" have been defined previously in your instructions under phase one of this trial.

The portion of the statutory definition of "alone with," which is likewise contained in the pattern jury instructions, omitted by the trial court reads as follows:

If the offender is in a private area where the offender has the right to be, the offender is not "alone with" a minor . . . if the offender is engaged in otherwise lawful activity and the presence of the minor . . . is incidental, accidental, or otherwise unrelated to the offender's lawful activity.

T.C.A. § 40-39-211(k)(1)(A)(ii); *see* T.P.I–Crim 10.17 (23rd ed. 2019).

Although the State argues in its brief that the Defendant raised this issue for the first time on appeal, the record reflects that the Defendant raised the issue in his supplemental motion for a new trial. *See* T.R.A.P. 3(e) ("[I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in . . . jury instructions granted or refused . . . , unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived."). Further, our supreme court has stated that when an "omitted" instruction "is one that is fundamental in nature, essential to a fair trial, . . . the failure to request [the instruction] . . . does not preclude a finding of error." *State v. Teel*, 793 S.W.2d 236, 249 (Tenn. 1990); *see State v. Dylan Brewer*, No. W2017-01725-CCA-R3-CD, 2019 WL 1109917, at *4 (Tenn. Crim. App. Mar. 11, 2019). More recently our supreme court has stated that "[a]n erroneous or inaccurate jury charge, as opposed to an incomplete charge, may be raised for the first time in a motion for a new trial and is not waived by the

failure to make a contemporaneous objection." *Faulkner*, 154 S.W.3d at 58. As a result, we conclude that the Defendant has not waived plenary appellate review.

In *Perrier*, our supreme court, as a matter of statutory construction, considered the effect of the self-defense statute's language regarding "not engaged in unlawful activity." 536 S.W.3d at 397-98. The self-defense statute reads, in relevant part, as follows:

(b)(1) . . . a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.

(2) . . . . a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

(A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;

(B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and

(C) The belief of danger is founded upon reasonable grounds.

T.C.A. § 39-11-611(b) (2018). The court determined that the

phrase 'not engaged in unlawful activity' is a condition on a person's statutory privilege not to retreat [and] . . . that a person is entitled to a jury instruction that he or she did not have to retreat from an alleged attack only when the person was not engaged in unlawful activity and was in a place the person had a right to be.

*Perrier*, 536 S.W.3d at 401; *see* T.C.A. § 39-11-611(b).

The supreme court further considered whether a trial court or a jury is the proper entity to determine if a defendant "was engaged in lawful activity for purposes of the retreat component of the self-defense statute[.]" *Perrier*, 536 S.W.3d at 401-02. Before *Perrier*, panels of this court had not been uniform on this issue. *Compare State v. Victor Dyson*, No. W2014-01818-CCA-R3-CD, 2015 WL 9466679, *4 (Tenn. Crim. App. Dec. 28, 2015) ("[T]he question of whether the [defendant] was engaged in lawful activity within the

meaning of the self-defense statute was properly within the province of the trial court."); *State v. Nico Farmer*, No. W2013-02736-CCA-R3-CD, 2015 WL 314704, at \*7 (Tenn. Crim. App. Jan. 23, 2015) (concluding that the trial court did not err by declining to provide a self-defense instruction after determining that the defendant was engaged in the unlawful conduct of attempting to rob the victim at the time of the shooting), *with State v. Antoine Perrier*, No. W2015-01642-CCA-R3-CD, 2016 WL 4707934, at \*12 (Tenn. Crim. App. Sept. 6, 2016) ("We conclude that when the issue of self-defense is fairly raised by the evidence, a trial court should not deny a defendant an instruction . . . solely on the basis that the defendant was engaged in unlawful activity" and "submit the issue of self-defense to the jury."), *perm. app. granted* (Tenn. Nov. 22, 2016); *State v. Deanty Montgomery*, No. E2014-01014-CCA-R3-CD, 2015 WL 3409485, at \*7-8, 10 (determining that whether a defendant is "acting in justifiable self-defense" and engaging in unlawful activity are within the province of the jury as the fact finder).

The *Perrier* court determined after considering legal authority in other jurisdictions that a trial court, not a jury, "makes the threshold determination whether to charge . . . self-defense, and . . . as part of that threshold determination, should decide whether to charge the jury that a defendant did not have a duty to retreat." *Perrier*, 536 S.W.3d at 403. As part of the trial court's obligations, the trial court "should consider whether the State has produced clear and convincing evidence that the defendant was engaged in unlawful activity such that the 'no duty to retreat' instruction would not apply." *Id*.

The trial court in this case applied *sua sponte* the principles espoused in *Perrier*, relying on similarities in the wording of the sexual offender registration statute, but the court did not consider all of the principles of statutory construction. Critical to the determination of guilt was whether the Defendant was alone with the victim. Whether the Defendant was "alone with" the victim is an element of the charged offense. The "failure to properly instruct the jury on a material element of an offense is a non-structural constitutional error" requiring a new trial, "unless the State can prove beyond a reasonable doubt that the error was harmless." *State v. Clark*, 452 S.W.3d 268, 295 (Tenn. 2014); *see State v. Cecil*, 409 S.W.3d 599, 610 (Tenn. 2013); *State v. Hawkins*, 406 S.W.3d 121, 128 (Tenn. 2013). Although the trial evidence showed that the Defendant and the victim were alone in the kitchen, the proof also established that, at least initially, the Defendant was invited into the home and allowed to cook with the victim. However, the court *sua sponte* omitted a critical portion of the statutory definition related to whether the Defendant was alone with the victim, depriving the jury of making this determination.

The supreme court's mandates in *Perrier* were limited to the self-defense statute, and our review of legal authority does not reflect any consideration by this court to extend *Perrier* beyond the self-defense statute. We are unpersuaded that the circumstances in this case are sufficiently analogous to circumstances involving self-defense to support an instruction of this nature. Although the remainder of the jury instructions were fair and

-36-

accurate, we conclude that the court erred by depriving the jury of determining whether the Defendant was not alone with the victim because he was engaged in otherwise lawful activity and whether his presence with the minor was incidental, accidental, or otherwise unrelated to the Defendant's lawful activity.

However, we also conclude that the error was not prejudicially erroneous and that the error was harmless beyond a reasonable doubt. *See Faulkner*, 154 S.W.3d at 58; *Clark*, 452 S.W.3d 295. In the first portion of the bifurcated trial, the jury found the Defendant guilty of two counts of aggravated sexual battery, which included one conviction for each incident of touching. The jury acquitted the Defendant of two counts of aggravated sexual battery, which were alternative theories for each incident of touching. Although the Defendant characterizes the jury's determinations as inconsistent verdicts, the proof viewed in the light most favorable to the State established that two incidents of aggravated sexual battery occurred. The jury's acquitting the Defendant of alternative theories of the offenses was of no consequence, and the verdicts reflected that the jury credited the victim's testimony, which was solely within its province. Aggravated sexual battery is not lawful activity. The record does not reflect that even if the instruction had been provided by the trial court, the jury would have reached a different verdict in connection with the sexual offender registry violation conviction. Therefore, the record does not reflect that the omission "infected the entire trial and resulted in a conviction that violates due process." *State v. James*, 315 S.W.3d 440, 446 (Tenn. 2010). Likewise, the record does not reflect that the jury instructions, "taken as a whole, failed to fairly submit the legal issues or misled the jury as to the applicable law." *State v. Majors*, 318 S.W.3d 850, 864 (Tenn. 2010). The omission by the court does not warrant a new trial. The Defendant is not entitled to relief on this basis.

## VII.   Cumulative Error Doctrine

The Defendant contends that the cumulative effect of the alleged trial errors entitles him to a new trial.

The cumulative error doctrine requires relief when "multiple errors [are] committed in the trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76-77 (Tenn. 2010) (internal citations omitted); *see State v. Jordan*, 325 S.W.3d 1, 79 (Tenn. 2010) ("'[T]he combination of multiple errors may necessitate . . . reversal . . . even if individual errors do not require relief.'") (quoting *State v. Cribbs*, 967 S.W.2d 773, 789 (Tenn. 1998)).

The Defendant has not demonstrated that multiple errors occurred during the trial. Without multiple instances of trial error to accumulate, the cumulative error doctrine does not apply. Thus, cumulative error relief is not appropriate.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE